## YUENGLING, Jr., v. SCHILE.

*(Circuit Court, S. D. New York. April 3, 1882.)*

1. COPYRIGHT—CHROMO.

A chromo, if a meritorious work or art, may be copyrighted, though designed and used for gratuitous distribution as an advertisement for the purpose of attracting business.

2. SAME—WHO ENTITLED TO COPYRIGHT.

It is only "authors and inventors" who, under the constitution, art. 1, § 8, are directly entitled to copyright. The title of all other persons is secondary, and derivative from them only; and, in claiming an injunction, third persons must show a legal title and an exclusive right to the copyright, lawfully derived from the author or inventor; to allege that the plaintiff is "proprietor," without more, is not enough.

3. SAME — INJUNCTION—INFRINGEMENT— PROTECTION LIMITED TO NATIVE ART.

In a suit for an injunction to restrain an alleged infringement, where it appeared that the plaintiff had imported copies of a chromo designed and printed in Europe by a foreign artist, and that the plaintiff had copyrighted the chromo by depositing two of his imported copies with the librarian of congress, and it further appeared that the defendant had never known of such chromo being copyrighted, had never seen any copyrighted impression, and had availed himself, in making a new chromo, of some material portions of the same design as plaintiff's chromo, which defendant had taken from a copy independently imported from Europe, and it did not appear whether the design of the plaintiff's chromo was new or old, or whether plaintiff had ever acquired any exclusive right from the artist, *held*, that the motion for a preliminary injunction should be denied. *Held, also,* that congress, in the revision of the copyright act of 1870, and in adding in that act to the previous subjects of copyright "a painting, drawing, chromo, statue, statuary, and models or designs intended to be perfected as works of the fine arts," did not intend any reversal or change of its inflexible policy, ever since the act of 1790, of protecting only native or resident authors and artists, and that the word "proprietor," in section 86 of the act of 1870, and in section 4952 of the Revised Statutes, must be construed in the limited and restricted sense in which it has been used in every act from that of 1790 downwards, viz., as the legal representative of a right derived from a native or resident author or artist.

4. STATUTES—AMENDMENTS, HOW CONSTRUED—CHROMOS EMBRACED IN "PRINTS."

Amendments of statutes are to be construed in harmony with a long-established policy rather than upon a mere literal reading which would introduce two diverse and contradictory policies in the same statute. *Held, also,* that "chromos," being in fact chromo-lithographic *prints*, were embraced in sections 1 and 8 of the act of May 21, 1831, under the term "prints," as well as in sections 86 and 103 (16 St. at Large, 212, 215) of the act of 1870, and are within the restrictions of section 4971 of the Revised Statutes; and that no copyright upon a chromo designed by a foreign artist abroad can be acquired by his representative resident here as "proprietor."

Motion for a Preliminary Injunction for Infringement of a Copyright.

*Charles Unangst*, for plaintiff.

*W. F. Pitshke*, for defendant.

BROWN, D. J. The plaintiff moves, upon a bill of complaint and affidavits, for a preliminary injunction to restrain an infringement of the plaintiff's rights under a copyright alleged to have been obtained by him on the twenty-third of August, 1880, upon a "chromo" entitled "Gambrinus and his followers." The moving papers allege that the complainant on that day was a citizen of the United States, and "proprietor of said chromo;" that he filed on that day, before publication, in the office of the librarian of congress, the title or description thereof, and on the same day deposited in his office two copies of the same, and gave notice of his copyright by inscribing on the visible front of such chromo, near the bottom, the words "Copyrighted 1880, by D. G. Yuengling, Jr., New York;" that he has been at great expense in producing such chromo, and that the same is of great value to him; that he has used it as a gratuitous advertisement in his business as a lager-beer brewer; and that the defendant is about to issue a piratical imitation of such chromo, in violation of the plaintiff's right in such copyright.

The complainant's chromo is of evident artistic merit. It is designed as a symbolic glorification of lager-beer drinking. In the center is a conspicuous figure of King Gambrinus, his left arm resting upon a keg of lager, and his right holding aloft a foaming glass of that beverage. On either side of him are a dozen figures of persons representing various classes in life, into whose eager hands his page is distributing the drink. This chromo, by its subject, its brilliant coloring, its excellent finish, and the artistic grouping of its figures, forms a striking picture, suitable for hanging in saloons, and well calculated to draw attention to the plaintiff, whose name is printed in large type beneath the figures as a person engaged in the lager-beer business, and constituting, therefore, a valuable mode of advertising. Among the Germans, and in the lager-beer trade, "Gambrinus" is familiarly known as the inventor of lager beer, while king of Flanders, as the legend goes, who used it first as a potion or draught.

The defendant's chromo, claimed to be an infringement, is a few inches smaller than the first, and presents the same general grouping, expression, and coloring of the figures, though having some conspicuous changes. Upon the head of the lager-beer cask the words ' Bock Beer" are conspicuously printed; and the figure of a goat, with its forefeet upon the top of the cask, appears prominently in the foreground beside the king. The troubadour, who in the first picture is

reclining upon the ground beside a maid drawing beer at the spigot, is omitted in the defendant's chromo, which also contains at the left a prominent typical figure of "Brother Jonathan," who is substituted in the place of a tailor in the first. There are various other minor changes.

Upon the whole, it is plain that the defendant's chromo is formed upon the same general design as the first, although with very impor-tant variations, and is an infringement of it, if the first was lawfully copyrighted before any publication of it. The defendant's chromo is designed as a card advertising the sale of "bock beer," which is sold mainly in the months of April and May.

From the defendant's affidavits it, however, appears that the com-plainant's chromo was designed in Europe by G. Bartsch, an alien European artist, whose name is engraved on the face of the print; that in the right-hand corner beneath are printed the words, "Witte-mann Bros., Publishers of Art Lithographs, New York;" that the work is strictly a chromo-lithographic print; that all the complain-ant's copies of it were printed and completed in Europe, whence it was imported to this city by the complainant, who thereupon under-took to take out a copyright by depositing two copies with the libra-rian of congress, as above stated, and stamping upon the left-hand cor-ner the words added by the complainant, "Copyrighted 1880, by D. G. Yuengling, Jr., New York;" that the defendant has long been a designer, and is also engaged in the lager-beer advertising business ; that in the summer of 1880, at the book-printer's establishment of Keely & Bartholom, 22 College place, in this city, where he had pre-viously been accustomed to get work done, he was shown a copy of all the colored portion of this chromo, but without the copyright stamp thereon; that he was informed by them at that time that it was a German work, not copyrighted, and had shortly before been imported and received by them from Europe; that he was then allowed to take this copy away with him, and had retained it ever since, and had made his own chromo therefrom, with the variations above pointed out; that he never saw any copy with any copyright stamp upon it, and had no knowledge of any such copyright until the commence-ment of this suit.

It is urged on the part of the defendant that the plaintiff's chromo is not the subject of a copyright, because it was designed, used, and circulated by him as a gratuitous advertising card for the benefit of his private business as a lager-beer brewer, and not for the instruction or improvement of the public. The case of *Cobbett* v. *Woodward*, Law

Rep. 14 Eq. 407, relied on by the defendant, was a case where the catalogue of an upholsterer, containing engravings of the articles offered by him for sale and circulated gratuitously, was held not to be the subject of copyright on this ground. A similar decision was made in this court in the case of *Collender* v. *Griffith*, 11 Blatchf. 212, concerning engravings of billiard tables offered for sale; but in that case it was held that the engravings were not works of art, and did not have any value or use as such, and that it was a mere mode of advertising the tables for sale. The case of *Ehret* v. *Pierce*, 18 Blatchf. 302, [S..C. 10 FED. REP. 553,] was decided upon the same principle. The case of *Cobbett* v. *Woodward, supra*, has not been followed in England, but was substantially overruled in the subsequent case of *Grace* v. *Newman*, Law Rep. 19 Eq. 623.

The plaintiff's chromo in the present case is not a mere engraving or print of any article which the complainant offers for sale. It is a work of the imagination, and has such obvious artistic qualities as, in my judgment, render it fairly a subject of copyright, without regard to the use which the plaintiff has made or may intend to make of it. Where the work in question is clearly one of artistic merit, it is not material, in my judgment, whether the person claiming a copyright expects to obtain his reward directly through a sale of the copies, or indirectly through an increase of profits in his business to be obtained through their gratuitous distribution.

There are several grounds, however, why the prelimiminary injunction sought in this case should not, I think, be granted.

1. It being conceded that the complainant is not the author or designer of this chromo, it is incumbent upon him to show how he became entitled to any exclusive copyright of it. In *Green* v. *Bishop*, 1 Cliff. 186, 198, *Clifford*, J., says:

"It is undoubtedly true that when a party comes into a court of law or equity seeking protection of a copyright, he must show that he is the author of the work, or that his title is derived from one sustaining that relation to the publication. *Little* v. *Gould*, 2 Blatchf. 181. The plaintiff does not show any such derivative title, and it appears that he is not the author."

The owner or proprietor of a work has not, since the act of 1870, any more than before, in that character alone any right of copyright. It is only to "authors and inventors," or to persons representing the author or inventor, that congress is authorized by the constitution to grant a copyright. Const. art. 1, § 8. The right of any other person than the author or inventor must therefore be a purely secondary and derivative one, and in enforcing any alleged copyright such a

person must show an exclusive right lawfully derived from the author or inventor; and this the plaintiff has not done. I find no other averment in the papers save that in the bill that on the twenty-third of August, 1880, he was "the proprietor of said chromo." This is not enough. It does not show any exclusive right derived from an original author. It appears, in opposition, that the work was designed and printed in Europe by an alien artist, and that copies of this design were imported into this country and came into defendant's hands independently of the complainant. There is no averment either that the design itself was *new*, or that the lithographic stones for the print were engraved by any person employed by the plaintiff or in his behalf, or that any right of copyright was ever transferred, or intended to be transferred, to the plaintiff by the author or artist. The "chromo" may be a mere copy of an European painting long since published in Europe, and free to be copied by any one. For aught that appears, the whole design may have been common property for an indefinite period, as would seem to be the case with the typical form of King Gambrinus. The complainant may have been the "proprietor" of the chromos which he imported, and may have "produced them at great expense," and yet have no exclusive right whatever, as between himself and the European artist, to the sole use even of the lithographic stones in Europe for the multiplication of any additional copies, much less to the original design. In that case he could acquire no copyright which would exclude the defendant, or any other person, from availing himself, either wholly or in part, of other copies obtained from Europe, either from the same stones, or from the common source of the design.

In *Johnson* v. *Donaldson*, 3 FED. REP. 22, (18 Blatchf. 287,) in reference to an alleged infringement of the copyright of a chromo, it was held by *Wallace*, J., that if the plaintiff acquired his copyright by appropriating a sketch from a foreign publication, he would not become a proprietor thereof, and could acquire no exclusive copyright; that even if the plaintiff were the artist and designer of the picture so appropriated, the "defendant would not be liable if he did not avail himself, directly or indirectly, of the plaintiff's production."

In *Rosenbach* v. *Dreyfuss*, 2 FED. REP. 217, it is said by *Choate*, J.: "It is not enough that the defendant *may* be liable if the facts stated in the complaint be true. It must appear that he *is* liable if the complaint is true." And judgment was for the defendant on demurrer, because it did not certainly appear that the articles described were

articles for which a copyright could be granted under the laws of the United States.

In this case it appears affirmatively, from the defendant's affidavits, that in making his chromo he has not availed himself of any copy of the chromo imported by the plaintiff; while from the want of any averment, either that the design was new, or that the plaintiff had ever acquired the exclusive rights of the foreign artist, in case the artist had any such exclusive right, it is impossible to say that the defendant, in availing himself of parts of a foreign copy, independently imported, violated any right of the author, much less of the plaintiff, who could only claim through the author.

2. The plaintiff claims that the act of July 8, 1870, (16 St. at Large, § 86; Rev. St. § 4952,) authorizes a citizen or resident of this country, if he be "proprietor" of any book, map, print, chromo, etc., to obtain a copyright therefor, although the author, inventor, or designer is an alien. The act of 1870, for the first time, uses the word "proprietor" in connection with the words "author, inventor, or designer," as one of the persons to whom a copyright may be granted, although ever since the act of 1790 a proprietor might obtain a copyright if he were the lawful representative of the exclusive rights of a native or resident author. Thus, though the connection in which the word "proprietor" is used in the act of 1870 is new, the use of the word itself in relation to copyrights is as old as the laws of copyright. 1 St. at Large, p. 125, §§ 2, 3, 4, 6; 2 St. at Large, p. 171, §§ 1, 3; 4 St. at Large, p. 437, § 3; 11 St. at Large, p. 139, § 1; 13 St. at Large, p. 540, § 2; 8 Geo. II. c. 13, § 1; 17 Geo. III. c. 57.

The literal reading of the section of the act of 1870 now embodied in section 4952 of the Revised Statutes, does not require that both the "author" and "proprietor" shall be citizens or residents of the United States. It provides that "any citizen of the United States or resident therein, who shall be the author, inventor, designer, or proprietor of any book, map, chart, dramatic or musical composition, engraving, cut, print, or photograph, or negative thereof, or of a painting, drawing, chromo, statue, statuary, and of models or designs intended to be perfected as works of the fine arts, and the executors, administrators, or assigns of any such person," may obtain a copyright; and section 103 of the act of 1870, embodied in section 4971 of the Revised Statutes, provides that "nothing therein shall be construed to prohibit the printing, publishing, importation, or sale of any book, map, chart, dramatic or musical composition, print, cut, engraving, or photo-

graph, written, composed, or made by any person not a citizen of the United States, nor resident therein." By virtue of the latter section an exclusive copyright in the work of any foreign author or artist in the subjects mentioned in that section is prohibited; but this section does not embrace the words "painting, drawing, chromo, statue, statuary, and models," which were introduced into the copyright law for the first time in the act of 1870; and on this ground it is urged by the complainant that a "proprietor" may obtain a copyright on the last-mentioned subjects, though the artist or author is an alien, because these are not prohibited by section 4971.

There are three objections to the plaintiff's contention in this respect: *First*, that it involves a reversal of the policy of the government from its foundation to protect American artists and authors only; *second*, that the word "proprietor," as used in the copyright laws, in itself means the representative of an artist or author who might himself obtain a copyright; and, *third*, that chromos are in reality embraced under the description of a "print" in the restrictive section, 4971.

It cannot be doubted that the purpose of the copyright laws from the foundation of the government has been to encourage native talent, and to protect American authors and artists only, (Drone, Copyright, 231, 257,) as the English acts were designed "to protect only those works which were designed, engraved, etched, or worked in Great Britain." *Page* v. *Townsend,* 5 Sim. 395, 404.

In the first act on the subject, that of May 31, 1790, the prohibition against an extension of the copyright to alien authors was as broad as the section authorizing copyright in favor of resident authors. 1 St. at Large, p. 124, §§ 1, 2, 5. With every extension of the subjects of copyrights made by subsequent statutes a corresponding restriction was inserted in the prohibitory section relating to foreign authors or artists until the act of 1870, when the few additional subjects above mentioned were added to the subjects of copyright without any corresponding insertion in the restrictive clause as respects foreign authors or artists. But even this omission, which was probably accidental, would not of itself have sufficed to admit copyright upon the works of foreign authors or artists, because the section authorizing the granting of copyright has always been limited to authors or artists being citizens or residents of the United States, or to their lawful representatives or assigns. It is only by the introduction of the word "proprietor" into the authorizing clause of the act of 1870, § 86, that any doubt could arise in regard to the new subjects of copyright then first introduced and not expressly restricted

as respects foreign artists; and its effect, by a mere literal reading, to allow a copyright on the works of foreign artists, has the appearance of being accidental only. After a policy, so early established and so constantly upheld, in reference to every subject of copyright, through all the extensions of the law up to 1870, to limit its protection to the works of native or resident authors, there is certainly a strong presumption that no change in this policy was intended in respect to a few articles only, added for the first time by the act of 1870, as subjects of copyright. There is nothing apparent in the nature of these new subjects of copyright themselves to distinguish them from the subjects of copyright previously existing which can serve as a probable foundation for any such supposed change of policy.

A copyright here, upon such articles designed and manufactured abroad, would be a double injury to American authors and designers. It would not only encourage the employment of foreign artists to the neglect and detriment of native designers, but it would prevent the use by the latter in this country of the foreign material, which would otherwise find its way here to the education and development of our native artists, and which would serve as models or suggestions for their own work. If all foreign works of this kind can be copyrighted in this country, through a mere transfer to some resident dealer, or agent of the foreign authors, our native artists will be thereby effectually foreclosed and debarred from availing themselves of all such materials for the improvement of their own works. Every intendment and every presumption to be derived from the history of copyright in this country, and from other parts of the act of 1870, seem to me to be against any such intention in that act. The effect of the literal construction contended for by the plaintiff would, moreover, be to make the act of 1870 inaugurate two diverse and conflicting policies in reference to the articles which may be copyrighted under section 86, now section 4952, Rev. St.; one policy virtually protecting foreign artists by copyright in respect to the few subjects first introduced into the law of 1870, and another policy of excluding them in regard to all the other and much larger number of subjects of copyright named in that act. I cannot believe, in the light of the history of the copyright acts, that, in reference to these few new subjects, congress intended to inaugurate any such change of policy, or to grant an exclusive copyright upon the importation of works wholly designed, manufactured, and completed abroad, upon merely depositing copies of lithographs in the congressional library by some resident owner. Such a construction would in effect confer upon foreign authors and artists, in respect to these sub-

jects of copyright, all the advantages of an international copyright act, without any reciprocal rights or advantages whatever in favor of our own authors and artists.

The argument for the plaintiff rests wholly upon the use of the word "proprietor" in the authorizing clause (section 86) of the act of 1870. But the history of the use of the term "proprietor," ever since the act of 1790, shows that it has always been used in the copyright laws in the limited and restricted sense of a person who by purchase or otherwise has lawfully acquired the exclusive rights of some native or resident author or artist, and in no other manner.

By section 1 of the act of 1790 the right to obtain a copyright is granted to a resident author upon *his* works, or to a resident, or to any other person being *a citizen* or *resident,* "who has *purchased* and legally acquired the copyright of any *such* work," or the executors, administrators, or assigns of such persons. Section 2 imposes a penalty for publishing, etc., "without the consent of the author or proprietor." The same expression, "author or proprietor," is again several times used in sections 2, 3, and 4 of that act. Thus, in this early act, the term "proprietor" is used to embrace all the persons except the original author himself who by section 1 might obtain a copyright, viz., the author's executors, administrators, or assigns, or any person who had "purchased or legally acquired the copyright." By section 1 it is seen, moreover, that the purchasers referred to are the purchasers of "*such* map, chart, book, or books;" *i. e.*, of the works of *resident* authors only. It is the same in all the subsequent statutes above cited.

From the act of 1790 down to 1870 there could be no "proprietor," in the sense of the copyright law, except the owner of the work of a citizen or resident author, including a transfer of such resident's right of copyright.

In the case of *Keene* v. *Wheatly,* 9 Am. Law Reg. 33, *Cadwallader,* J., says, (page 45:) "The other sections concern copyright. They apply only to authors who, if not citizens, must be residents of the United States, and proprietors under derivations of title from *such* authors. No other proprietor can obtain a copyright under the act." A third person may become such an owner or "proprietor" through a transfer or assignment, verbal or written, embracing the right of copyright, after the work is completed, or by virtue of an original employment under a contract with the author, which, by agreement, is to confer upon the employer the complete ownership both of the work itself and of any copyright that may be obtained thereon. Upon

such a contract "the person who remunerates," says the Vice Chancellor J., in *Grace* v. *Newman*, L. R. 19 Eq. 623, "must be taken to be the equitable assignee" of the copyright. *Parton* v. *Prang*, 3 Clif. 537, 547, 551; *Boucicault* v. *Fox*, 5 Blatchf. 87; *Little* v. *Gould*, 2 Blatchf. 362; *Sheldon* v. *Houghton*, 5 Blatchf. 285; *Paige* v. *Banks*, 7 Blatchf. 152; 13 Wall. 608; Drone, Copyright, 238, 243–5, 257–9.

To a mere owner of a work as such, to a "proprietor" in that sense only, without any express or implied transfer from the author or inventor of his right to a copyright, congress, as above observed, is not by the constitution vested with the power to grant a copyright. Congress is not, indeed, prohibited from protecting foreign authors and artists, if it choose to do so; but, in view of its inflexible refusal to do so up to this time, the phraseology of the statute of 1870, in section 86, is not to my mind a sufficient indication of any such change of purpose. When, therefore, in the act of 1870, the word "proprietor" is found used, for the first time, in connection with the words "author, inventor, designer," as a person to whom copyrights may be granted, it must be construed, if possible, in harmony with the inflexible policy and intent of the copyright law up to that date, and be held to be used in the same sense in which the word had always before been used in the copyright law of this country, viz., as meaning the lawful owner and representative, whether by assignment, employment, death, or other lawful succession, of the exclusive rights of some native or resident author or artist only. It must be construed in harmony with the policy of the copyright law, rather than upon its literal and independent reading. Upon the same principle the supreme court, in the late case of *Wilmot* v. *Mudge*, 103 U. S. 217, 220, held that the literal reading of an amendment of the section of the bankrupt law, as to the effect of a discharge of a fraudulent debt by a composition, must give way to the manifest general purpose and intent of the act. In that case the court says:

"It is conceded that the defendants in error came within the terms of this provision, and it is insisted that they must be bound by the composition. We admit the apparent force of the logic. But, as we have already said, these several statutes, sections, and provisions are to be construed as parts of one entire system of bankrupt law. * * * There is no injustice nor any difficulty in restraining the language of the composition section, as regards its binding force, to persons whose debts are capable of being discharged by the bankrupt law. * * * In this manner both provisions of the bankrupt law can stand and be consistent."

Upon the same principle the word "proprietor" should be construed so as to produce a harmonious rather than a contradictory policy in

the different parts of the copyright law, by giving that word the restricted meaning and sense in which it has been used in all the past copyright acts of this country. As respects this chromo, the plaintiff was not a "proprietor" of a native work, and, upon the construction here given, he was not, therefore, a "proprietor" within the meaning of section 4952, even had he shown an exclusive right from the foreign artist, and he is therefore not entitled to the benefits of the copyright law in this chromo.

3. The chromo in question is nothing but a lithographic *print* in colors. Lithographs were undoubtedly embraced in the term "print" under the act of 1831, both in the authorizing and the restricting clauses. 4 St. at Large, p. 436, §§ 1, 8. The only difference between chromo-lithographic prints and other lithographs is that the former are printed from several stones, namely, one for each color, while the latter are printed from one stone, with ink of some kind. It cannot be contended that a "print" is any the less a "print" because struck off in different colors; and it has been held that playing cards printed in colors are "prints." *Richardson* v. *Miller*, 3 Law & Eq. Rep. (Am.) 614. A print is "a mark or form made by impression or printing; anything printed; that which, being impressed, leaves its form, as a cut in wood or metal, to be impressed on paper; the impression made; a picture; a stamp; the letters in a printed book; an impression from an engraved plate; a picture impressed from an engraved surface," etc. Webst. Dict.; Worces. Dict.; *Wood* v. *Abbott*, 5 Blatchf. 325. "It means, apparently, a picture; something complete in itself, similar in kind to an engraving, cut, or photograph." *Rosenbach* v. *Dreyfuss*, 2 FED. REP. 217, 221.

Chromo-lithographs were therefore copyrightable as "prints" under the act of 1831, and as such were within the restriction of section 8 of that act. As chromo-lithographs became largely dealt in, and, under the slang name of "chromos," became a considerable article of trade, it was not unnatural that for greater certainty they should be mentioned by name in the revision of the copyright act of 1870. But congress did not thereby abolish the restriction which already existed upon copyrighting them when made by alien artists, because such chromo-lithographic prints are included in the word "print," which is contained both in section 103 of the act of 1870, and in section 4971 of the Revised Statutes. Under that general designation of "prints," being restricted before, they are restricted still; for in the use of the new and specific word "chromo" in the act of 1870, and in section 4952 of the Revised Statutes, there is nothing

incompatible with the restriction under the more general word
"print," which both statutes continue in force as before.   *U. S.* v.
*Sixty-five Terra Cotta Vases, etc.*, 10 Fed. Rep. 880.

The preliminary injunction should therefore be denied.