### FRASER v. YACK et al.

(Circuit Court of Appeals, Seventh Circuit. May 6, 1902.)

#### No. 853.

1. COPYRIGHTS—PERSONS ENTITLED TO COPYRIGHT—CONSTRUCTION OF CONTRACT.

In 1890 an American publisher entered into a contract with an English author, having in preparation a novel to be published serially in an English magazine, by which he agreed to pay £20 "in return for the sole and exclusive use of advance sheets of said novel in the United States and dominion of Canada"; the price to be paid "on publication of the novel in America." The author agreed to deliver to the publisher a complete copy of the work, either in advance sheets or manuscript, at least two months prior to the completion of its serial publication in England. Prior to the publication of the work in America, in October, 1891, the greater portion of it had been published serially in England. Until July 1, 1891, there was no statute in the United States under which a copyright could be secured on a work by a foreign author. *Held* that, construing the contract in the light of such facts, it conferred no rights of proprietorship in the manuscript of the work which entitled the American publisher to copyright the same in the United States, but only the right to the exclusive use of the advance sheets to enable him to publish the work in America coincidently with or in advance of its publication in England.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

This bill was originally filed against James M. Barrie, a subject of the king of Great Britain and Ireland, and Charles Frohman, a citizen of the state of New York. No service of subpoena appears to have been had. Subsequently the others named were made defendants, but only the de-

fendants Yack and Hards seem to have been served or to have appeared. The bill charges that Mr. Barrie, the author of "The Little Minister," a novel to be issued serially in the year 1891 in the magazine "Good Words," published in London, on May 8, 1890, entered into a contract with John W. Lovell, as follows: "This contract entered into and made this eighth day of May, 1890, between J. M. Barrie, of London, and John W. Lovell, of New York, witnesseth: (1) In consideration of the premises, the said J. M. Barrie hereby grants and assigns to the said John W. Lovell the sole and exclusive right to publish from advance sheets in the United States and dominion of Canada a novel by him to be issued serially in a magazine known as 'Good Words' during the year 1891. And the said J. M. Barrie agrees to deliver to the said John W. Lovell a complete copy of such work, either in the form of advance sheets or MS., at least two calendar months prior to the serial completion of such work in England; and, in the event of his failure so to do, this contract, at the option of the said John W. Lovell, shall become inoperative and void. (2) The said John W. Lovell agrees, in return for the sole and exclusive use of advance sheets of the said novel in the United States and the dominion of Canada, to pay the said J. M. Barrie twenty pounds (£20) on publication of the novel in America." Lovell assigned this contract to the United States Book Company, which company on June 19, 1891, deposited with the librarian of congress at Washington a printed copy of the title of the book, and on October 14, 1891, deposited two copies of the book in that office. The publication of the novel was begun in the January, 1891, number of the monthly periodical Good Words, in London, and continued throughout that year. Thirty-eight chapters had been thus published prior to the publication of the completed book by the United States Book Company in America, and prior to the deposit of the copies with the librarian; the remaining seven chapters of the book being published in the London magazine subsequently. The book, as published in the United States by the United States Book Company, contained the notice in form required by the law of copyright, and the bill charges full compliance with the requirements of law with respect to copyrights, whereby, as it is claimed, the United States Book Company became the sole owner of the copyright of the book in the United States of America. On May 29, 1900, the complainant became the owner of the rights of the United States Book Company under the contract between Barrie and Lovell, and of the copyright, if any, secured by that company. It is further charged that Mr. Barrie in 1897, without the consent of Lovell or any of his successors in interest, dramatized the novel, "The Little Minister," and secured its production and performance upon the stage within the United States under contract with the defendant Frohman; that such dramatization is in four acts, of which acts 3 and 4 are founded in plot, incident and characters upon, and much of its language is contained in chapters 39 to 45, inclusive of the novel, and such acts are important parts of the dramatization; that the defendants Yack and Hards are managers or actors in the theatrical company associated with Frohman, and were about to produce the play and perform therein at certain places stated in the bill, within the jurisdiction of the court. The bill sought an injunction restraining the performance of the drama. Yack and Hards demurred to the bill upon the grounds (1) that at the date of the contract the laws of the United States did not authorize a copyright in favor of the works of a foreign author; (2) that the story was first to be published in the English magazine, before any right of publication in the United States; (3) that the right granted by the contract was merely a license granting the exclusive right to publish the novel from advance sheets after publication thereof by the author; (4) that the United States Book Company never became the proprietor of the book, and had no authority to procure a copyright; (5) laches by the complainant in the assertion of his alleged right. On May 1, 1901, the court sustained the demurrer and dismissed the amended bill for want of equity (105 Fed. 787), and on October 29, 1901, an appeal was allowed to this court.

Millard R. Powers, for appellant.

George A. Dupuy, for appellees.

Before JENKINS and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts as above). The office of all construction and interpretation of contracts is to ascertain the intention of the parties, and the meaning of the words they have used,—their real design as disclosed by the whole contract. For that purpose we may resort to surrounding circumstances and the condition of the parties at the time, not to ascertain what they may have secretly intended, but to resolve doubtful expressions and to ascertain the true meaning of the agreement. And this is to be judged, not from any separate provision or disconnected expression in the writing, but taking it in its entirety.

It is insisted for the appellant that the right acquired by Lovell to the manuscript of "The Little Minister," so far at least as concerns the United States of America and Canada, was that of proprietor, and that therefore he had under the law the right of copyright. At the date of this contract, May 8, 1890, copyright was not authorized in this country in favor of foreign authors (Rev. St. § 4952); nor, as it would seem, could a foreign author assign or transfer to a citizen his manuscript or common-law right of property therein, so that the latter could have copyright protection within the United States. Yuengling v. Schile (C. C.) 12 Fed. 97, 102–107. The international copyright law granting copyright to foreign authors was passed March 3, 1891, and went into effect July 1, 1891. 26 Stat. 1106–1110, c. 565. It thus appears that the contract in question was entered into nearly ten months prior to the passage of this law. At its date Mr. Barrie had no right to acquire copyright within the United States, and could grant no such right. Nor could an assignee of his manuscript and common-law right therein acquire such copyright. It is therefore manifest that it was not, and could not have been, within the contemplation of the contracting parties to grant or to acquire a right to that which did not exist and was not the subject of a grant. Unless, therefore, by the agreement in question Lovell became the owner and the proprietor of the manuscript, to the exclusion of Mr. Barrie's right therein, and could avail himself, with respect to that work, of the privilege conferred by subsequent legislation, he has no right to copyright of the work. The parties at the execution of the contract were thus circumstanced: Mr. Barrie was engaged in writing a novel for serial publication in an English magazine, to be therein published monthly, commencing with the January number, 1891. By the agreement, Mr. Barrie granted and assigned to Mr. Lovell "the sole and exclusive right to publish from advance sheets, in the United States and dominion of Canada," the work to be published serially in the English magazine during the year 1891, and agreed to deliver to Lovell a complete copy of the work, "either in the form of advance sheets or MS., at least two calendar months prior to the serial completion of such work in England." In consideration thereof, Lovell agreed to pay "for the sole and exclusive use of advance sheets of the said novel in the United States and the dominion of Canada" £20 upon its publication in America. It may be doubted whether the contract contemplated the serial publication of the work in America, as it provides for the delivery of the advance

sheets or manuscript at least two calendar months prior to the serial completion of the work in England; and we are not informed by the bill concerning the fact of serial publication here, so that we can judge of the practical construction placed upon the contract by the parties. If Mr. Barrie was not bound to furnish any advance sheets or any portion of the manuscript until two months prior to the completion of the serial publication in England, then it is clear that as to the parts published in England before the filing of copies of the book with the librarian of congress, namely, the first 38 chapters, there was no possible right of copyright under the international copyright law. Holmes v. Hurst, 174 U. S. 82, 19 Sup. Ct. 606, 43 L. Ed. 904; Same v. Donohue (C. C.) 77 Fed. 179. The story contained 45 chapters, and was completed in England in the December number of the magazine, and all but seven chapters were published in England prior to the deposit of the book in the office of the librarian of congress. At the most, therefore, copyright could only comprehend the last seven chapters of the work. Bearing in mind that, upon publication in England of the work or parts of the work, there could be no copyright in the United States under the international copyright law of the parts thus published, and that at the time of the contract there was no international copyright law, the meaning of the contract would seem to be clear. Mr. Barrie could only secure any sum for publication of the work in America by granting the use of his manuscript in advance of its publication in England, for any American publisher could after such publication issue it here without liability to Mr. Barrie or to Mr. Lovell. It could be reproduced with impunity. An American publisher could only be first upon the market here by publishing it simultaneously with or in advance of its publication in England, and that could only be accomplished by obtaining advance sheets of the manuscript before the appearance of the story or any of its parts in the English magazine. It is clear to us that the purpose of the contract was to accomplish this simultaneous publication. Mr. Barrie did not sell his manuscript, or dispose of his common-law right thereto. He merely agreed to furnish advance sheets, and gave to Lovell the exclusive right to publish them either simultaneously with, or within a short time before, the completion of the serial publication in England. Lovell agreed to pay £20, not for the work, not to become proprietor of the work, but "for the sole and exclusive use of the advance sheets" of the novel in the United States. This is a mere license to Lovell, giving him the advantage of the use of advance sheets. That use, it is true, was to be exclusive; that is to say, Mr. Barrie agreed on his part that he would not furnish advance sheets to another. Lovell only acquired a qualified interest. He did not become the absolute owner. One of the qualities of absolute ownership in a work is that the author has the right to withhold it from publication if he so desire. Lovell could not do that. Under this contract he was bound to publish it, for the consideration expressed in the contract was not payable until publication. This construction of the instrument is fortified also by the amount of the consideration. As the author had no right of copyright, and as upon publication in England any one had right to publish it in America, the author could receive nothing for the work published here, except such

as he might be able to obtain by allowing its publication here simultaneously with or in advance of its publication in England. That accounts for the trifling consideration in the contract, and speaks the intent of the parties. It is inconceivable that a distinguished author would have disposed of proprietorship in his manuscript for so inconsiderable a sum. We are of opinion that the contract conferred no rights of proprietorship in the manuscript, but only the right of publication coincidently with or in advance of the publication of the work in England.

The decree is affirmed.