## HOLMES *v.* HURST.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 124. Argued March 3, 1899. — Decided April 24, 1899.

The serial publication of a book in a monthly magazine, prior to any steps taken toward securing a copyright, is such a publication of the same within the meaning of the act of February 3, 1831, c. 16, as to vitiate a copyright of the whole book, obtained subsequently, but prior to the publication of the book as an entirety.

THIS was a bill in equity by the executor of the will of the late Dr. Oliver Wendell Holmes, praying for an injunction against the infringement of the copyright of a book originally published by plaintiff's testator under the title of "The Autocrat of the Breakfast Table."

The case was tried upon an agreed statement of facts, the material portions of which are as follows:

Dr. Holmes, the testator, was the author of "The Autocrat of the Breakfast Table," which, during the years 1857 and 1858, was published by Phillips, Sampson & Company of Boston, in twelve successive numbers of the Atlantic Monthly, a periodical magazine published by them, and having a large circulation. Each of these twelve numbers was a bound volume of 128 pages, consisting of a part of "The Autocrat of the Breakfast Table," and of other literary compositions. These twelve parts were published under an agreement between Dr. Holmes and the firm of Phillips, Sampson & Company, whereby the author granted them the privilege of publishing the same, the firm stipulating that they should have no other right in or to said book. No copyright was secured, either by the author or by the firm or by any other person, in any of the twelve numbers so published in the Atlantic Monthly; but on November 2, 1858, after the publication of the last of the twelve numbers, Dr. Holmes deposited a printed copy of the title of the book in the clerk's office of the District Court of the District of Massachusetts, wherein the author resided, which copy the clerk recorded. The book was published by Phillips, Sampson & Company in a separate volume on November 22, 1858, and upon the same day a copy of the same was delivered to the clerk of the District Court. The usual notice, namely, "Entered according to act of Congress, 1858, by Oliver Wendell Holmes, in the Clerk's Office of the District Court of the District of Massachusetts," was printed in every copy of every edition of the work subsequently published, with a slight variation in the edition published in June, 1874.

On July 12, 1886, Dr. Holmes recorded the title a second time; sent a printed copy of the title to the Librarian of Congress, who recorded the same in a book kept for that purpose,

and also caused a copy of this record to be published in the Boston Weekly Advertiser; and in the several copies of every edition subsequently published was the following notice: "Copyright, 1886, by Oliver Wendell Holmes."

Since November 1, 1894, defendant has sold and disposed of a limited number of copies of the book entitled "The Auto-crat of the Breakfast Table," all of which were copied by the defendant from the twelve numbers of the Atlantic Monthly exactly as they were originally published, and upon each copy so sold or disposed of a notice appeared that the same was taken from the said twelve numbers of the Atlantic Monthly.

The case was heard upon the pleadings and this agreed statement of facts, by the Circuit Court for the Eastern District of New York, and the bill dismissed. 76 Fed. Rep. 757. From this decree an appeal was taken to the Circuit Court of Appeals for the Second Circuit, by which the decree of the Circuit Court was affirmed. 51 U. S. App. 271. Whereupon plaintiff took an appeal to this court.

*Mr. Rowland Cox* for appellant.

*Mr. Andrew Gilhooly* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case raises the question whether the serial publication of a book in a monthly magazine, prior to any steps taken toward securing a copyright, is such a publication of the same within the meaning of the act of February 3, 1831, c. 16, 4 Stat. 436, as to vitiate a copyright of the whole book, obtained subsequently but prior to the publication of the book as an entirety.

The right of an author, irrespective of statute, to his own productions and to a control of their publication, seems to have been recognized by the common law, but to have been so ill defined that from an early period legislation was adopted to regulate and limit such right. The earliest recognition of

this common law right is to be found in the charter of the Stationers' Company, and certain decrees of the Star Chamber promulgated in 1556, 1585, 1623 and 1637, providing for licensing and regulating the manner of printing, and the number of presses throughout the Kingdom, and prohibiting the publication of unlicensed books. Indeed, the Star Chamber seems to have exercised the power of search, confiscation and imprisonment without interruption from Parliament, up to its abolition in 1641. From this time the law seems to have been in an unsettled state — although Parliament made some efforts to restrain the licentiousness of the press — until the eighth year of Queen Anne, when the first copyright act was passed, giving authors a monopoly in the publication of their works for a period of from fourteen to twenty-eight years. Notwithstanding this act, however, the chancery courts continued to hold that, by the common law and independently of legislation, there was a property of unlimited duration in printed books. This principle was affirmed so late as 1769 by the Court of King's Bench in the very carefully considered case of *Millar* v. *Taylor*, 4 Burrows, 2303, in which the right of the author of "Thompson's Seasons," to a monopoly of this work, was asserted and sustained. But a few years thereafter the House of Lords, upon an equal division of the judges, declared that the common law right had been taken away by the statute of Anne, and that authors were limited in their monopoly by that act. *Donaldsons* v. *Becket*, 4 Burrows, 2408. This remains the law of England to the present day. An act similar in its provisions to the statute of Anne was enacted by Congress in 1790, and the construction put upon the latter in *Donaldsons* v. *Becket*, was followed by this court in *Wheaton* v. *Peters*, 8 Pet. 591. While the propriety of these decisions has been the subject of a good deal of controversy among legal writers, it seems now to be considered the settled law of this country and England that the right of an author to a monopoly of his publications is measured and determined by the copyright act — in other words, that while a right did exist by common law, it has been superseded by statute.

The right thus secured by the copyright act is not a right to the use of certain words, because they are the common property of the human race, and are as little susceptible of private appropriation as air or sunlight; nor is it the right to ideas alone, since in the absence of means of communicating them they are of value to no one but the author. But the right is to that arrangement of words which the author has selected to express his ideas. Or, as Lord Mansfield describes it, " an incorporeal right to print a set of intellectual ideas, or modes of thinking, communicated in a set of words or sentences, and modes of expression. It is equally detached from the manuscript, or any other physical existence whatsoever." 4 Burrows, 2396. The nature of this property is perhaps best defined by Mr. Justice Erle in *Jefferys* v. *Boosey*, 4 H. L. C. 815, 867 : " The subject of property is the order of words in the author's composition;˜not the words themselves, they being analogous to the elements of matter, which are not appropriated unless combined, nor the ideas expressed by those words, they existing in the mind alone, which is not capable of appropriation."

The right of an author to control the publication of his works, at the time the title to the " Autocrat" was deposited, was governed by the act of February 3, 1831, c. 16, 4 Stat. 436, wherein it is enacted :

" SEC. 1. That from and after the passing of this act, any person or persons, being a citizen or citizens of the United States, or resident therein, who shall be the author or authors of a book or books, map, chart or musical composition, which may be now made or composed, and not printed and published, or shall hereafter be made or composed, . . . shall have the sole right and liberty of printing, reprinting, publishing and vending such book or books, . . . in whole or in part, for the term of twenty-eight years from the time of recording the title thereof, in the manner hereinafter directed."

" SEC. 4. That no person shall be entitled to the benefit of this act, unless he shall, *before publication*, deposit a printed copy of the title of such book or books . . . in the clerk's office of the District Court of the District wherein the author

or proprietor shall reside, etc. And the author and proprietor of any such book . . . shall, within three months from the publication of said book, . . . deliver or cause to be delivered a copy of the same to the clerk of said District."

The substance of these enactments is that, by section one, the author is only entitled to a copyright of books not printed and published; and by section four, that, as a preliminary to the recording of a copyright, he must, before publication, deposit a printed copy of the title of such book, etc.

The argument of the plaintiff in this connection is, that the publication of the different chapters of the book in the Atlantic Monthly was not a publication of the copyright book which was the subject of the statutory privilege; that if Dr. Holmes had copyrighted and published the twelve parts, one after the other, as they were published in the magazine, or separately, there would still have remained to him an inchoate right, having relation to the book as a whole; that his copyright did not cover and include the publication of the twelve parts printed as they were printed in the Atlantic Monthly, and that while the defendant had a right to make copies of those parts and to sell them separately or collectively, he had no right to combine them into a single volume, since that is the real subject of the copyright. Counsel further insisted that, if the author had deposited the twelve parts of the book, one after the other, as they were composed, he would not have acquired the statutory privilege to which he seeks to give effect; that to secure such copyright it was essential to do three things: (1) Deposit the title "The Autocrat of the Breakfast Table;" (2) deposit a copy of the book "The Autocrat of the Breakfast Table;" and (3) comply with the provisions concerning notice; that he could acquire the privilege of copyright only by depositing a copy of the very book for which he was seeking protection; that if the taking of a copyright for each chapter created a privilege which was less than the privilege which would have been acquired by withholding the manuscript until the book was completed, and then taking the copyright, this copyright is valid. His position briefly is that no one of the twelve copyrights, if each chapter were copyrighted, nor

all of them combined, could be held to be a copyright, in the sense of the statute, of the book, which is the subject of the copyright in question; and that neither separately nor collectively could they constitute the particular privilege, which is the subject of the copyright of "The Autocrat of the Breakfast Table," as a whole.

We find it unnecessary to determine whether the requirement of section four could have been met by a deposit of the book, "The Autocrat of the Breakfast Table," prior to the publication of the first part in the Atlantic Monthly, or whether, for the complete protection of the author, it would be necessary that each part should be separately copyrighted. This would depend largely upon the question whether the three months from the publication, within which the author must deposit a copy of the book with the clerk, would run from the publication of the first or the last number in the Atlantic Monthly.

That there was a publication of the contents of the book in question, and of the entire contents, is beyond dispute. It follows from this that defendant might have republished in another magazine these same numbers as they originally appeared in the Atlantic Monthly. He might also, before the copyright was obtained, have published them together, paged them continuously, and bound them in a volume. Indeed, the learned counsel for the plaintiff admits that the defendant had the right to make copies of these several parts, and to sell them separately or collectively; but insists that he had no right to combine them in a single volume. The distinction between publishing these parts collectively and publishing them in a single volume appears to be somewhat shadowy; but assuming that he had no such right, it must be because the copyright protected the author, not against the republishing of his intellectual productions or "the order of his words," but against the assembling of such productions in a single volume. The argument leads to the conclusion that the whole is greater than the sum of all the parts — a principle inadmissible in logic as well as in mathematics. If the several parts had been once dedicated to the public, and the monopoly of the

author thus abandoned, we do not see how it could be re-claimed by collecting such parts together in the form of a book, unless we are to assume that the copyright act covers the process of aggregation as well as that of intellectual production. The contrary is the fact.

If the patent law furnishes any analogy in this particular —and we see no reason why it may not — then there is nothing better settled than that a mere aggregation of familiar elements, producing no new result, is not a patentable combination. *Hailes* v. *Van Wormer*, 20 Wall. 353; *Reckendorfer* v. *Faber*, 92 U. S. 347; *Pickering* v. *McCullough*, 104 U. S. 310; *Richards* v. *Chase Elevator Co.*, 158 U. S. 299. But if there were anything more than mechanical skill involved in the collocation of the several parts of this work, it would be the exercise of inventive genius and the subject of a patent rather than a copyright. If an author permit his intellectual production to be published either serially or collectively, his right to a copyright is lost as effectually as the right of an inventor to a patent upon an invention which he deliberately abandons to the public — and this, too, irrespective of his actual intention not to make such abandonment. It is the intellectual production of the author which the copyright protects and not the particular form which such production ultimately takes, and the word "book" as used in the statute is not to be understood in its technical sense of a bound volume, but any species of publication which the author selects to embody his literary product. We are quite unable to appreciate the distinction between the publication of a book and the publication of the contents of such book, whether such contents be published piecemeal or *en bloc.*

If, as contended by the plaintiff, the publication of a book be a wholly different affair from the publication of the several chapters serially, then such publication of the parts might be permitted to go on indefinitely before a copyright for the book is applied for, and such copyright used to enjoin a sale of books which was perfectly lawful when the books were published. There is no fixed time within which an author must apply for a copyright, so that it be "before publica-

tion;" and if the publication of the parts serially be not a publication of the book, a copyright might be obtained after the several parts, whether published separately or collectively, had been in general circulation for years. Surely, this cannot be within the spirit of the act. Under the English copyright act of 1845, provision is made for the publication of works in a series of books or parts, but it has always been held that each part of a periodical is a book within the meaning of the act. *Henderson* v. *Maxwell*, L. R. 4 Ch. Div. 163; *Bradbury* v. *Sharp*, W. N. (1891) 143.

We have not overlooked the inconvenience which our conclusions will cause, if, in order to protect their articles from piracy, authors are compelled to copyright each chapter or instalment as it may appear in a periodical; nor the danger and annoyance it may occasion to the Librarian of Congress, with whom copyrighted articles are deposited, if he is compelled to receive such articles as they are published in newspapers and magazines; but these are evils which can be easily remedied by an amendment of the law.

The infringement in this case consisted in selling copies of the several parts of "The Autocrat of the Breakfast Table" as they were published in the Atlantic Monthly, and each copy so sold was continuously paged so as to form a single volume. Upon its title page appeared a notice that it was taken from the Atlantic Monthly. There can be no doubt that the defendant had the right to publish the numbers separately as they originally appeared in the Atlantic Monthly, (since those numbers were never copyrighted,) even if they were paged continuously. When reduced to its last analysis, then, the infringement consists in binding them together in a single volume. For the reasons above stated, this act is not the legitimate subject of a copyright.

The decree of the court below must therefore be

*Affirmed.*