**NATIONAL COMICS PUBLICATIONS, Inc. v. FAWCETT PUBLICATIONS, Inc., et al.**

United States District Court
S. D. New York.
April 10, 1950.

On Motion for Retaxation June 23, 1950.

Phillips, Nizer, Benjamin & Krim, New York City, for plaintiff (Louis Nizer, Walter S. Beck, Paul Martinson and Seymour Shainswit, all of New York City, of counsel).

DeWitt, Van Aken, Nast & Chapman, and Nims, Verdi & Martin, all of New York City, for defendant Fawcett Publications, Inc. (Wallace H. Martin, Edgar H. A. Chapman, Walter J. Halliday and Marion L. Severn, all of New York City, of counsel).

Meyer H. Lavenstein, New York City, for defendants Republic Pictures Corp. and Republic Productions, Inc.

COXE, District Judge.

This is an action against Fawcett Publications, Inc. (hereafter referred to as "Fawcett") and Republic Pictures Corporation and the latter's wholly-owned subsidiary, Republic Pictures, Inc. (both hereafter referred to as "Republic"), for copyright infringement under the 1909 Copy-

right Act, as amended, 17 U.S.C.A. § 1 et seq., and for unfair competition. The action was instituted on September 5, 1941, by Detective Comics, Inc. (hereafter referred to as "Detective") and by Superman, Inc.; they were later merged into National Comics Publications, Inc., which has been substituted as sole plaintiff. An amended complaint was filed in November 1945, but the action was not brought to trial until March 1948. Damages and an injunction are sought because of alleged infringements of the copyrights upon all the issues of two comic magazines published by Detective and Superman, respectively, viz., "Action Comics" and "Superman". It is asserted by plaintiff that there was published in these magazines a large amount of original matter, including "a variety and series of original cartoons, scenes, characters, incidents and pictorial delineations revolving principally about the figure and character of 'Superman'."

The infringements alleged in the amended complaint are:

(1) The publication by Fawcett of two magazines, entitled "Whiz Comics" and "Captain Marvel Adventures", which contained "a continuity of comic strips revolving about a principal character known as 'Captain Marvel'", which strips were copied from plaintiff's copyrighted material, and the publication by Fawcett of additional magazines, entitled "Captain Marvel, Jr.", "Mary Marvel Comics", "WOW Comics", "America's Greatest Comics" and "Master Comics", likewise containing the continuous strip cartoon known as "Captain Marvel".

(2) The production and exhibition throughout the United States during the period of 1940–1941 by Republic of a motion picture serial photoplay entitled "The Adventures of Captain Marvel"; and

(3) The manufacture and distribution, in connection with these magazines and the motion picture, of certain articles of merchandise, upon which the figure of "Captain Marvel" was depicted, and which constituted unfair competition.

The principal defenses are non-infringement, that the copyrights are either invalid or have been abandoned, and absence of unfair competition. Republic also asks that, if it is found liable to plaintiff, it have judgment over against Fawcett for the amount thereof under its indemnity agreement with Fawcett.

The "Action Comics" Magazine.

Detective, which, with its affiliated companies, had been engaged in publishing comic magazines, began the publication in June 1938 of a new monthly comic magazine, entitled "Action Comics". Each number contained 64 pages and sold for ten cents a copy. Publication was continued until the time of the trial. Each number was copyrighted in the name of Detective. The magazine contained several comic cartoon strips featuring different characters. A strip consists of a series of panels. The panels contain scenes and incidents revolving about a principal character and, in a so-called balloon, a catch-phrase, or a remark, or a description of the incident represented. Thus the strips may be called short stories in pictorial form.

The leading feature in each number was a comic cartoon strip or story which depicted the figure and actions of an athletic human being, a new character called "Superman", with distinctive features and a distinctive type of costume, who was portrayed in various scenes and incidents as having and exercising superhuman qualities and being a blessing to mankind as an avenger of all evil, and as being in ordinary life one Clark Kent, a meek newspaper reporter wearing eye glasses. Jerome Siegel and Joseph Shuster, the authors and artists of the strips or stories, produced them under a contract with Detective.

The "Superman" stories in the first six numbers of "Action Comics", published from June to November 1938, were reprinted by Detective, with a 1939 copyright date, in Numbers 1 and 3 of the "Superman" magazine, published in the summer and winter of 1939, respectively. Fawcett insists that this resulted in loss of the copyrights upon the stories. This would be so if it were not for the fact that these two numbers of "Superman" magazine contained substantial new and original matter,

in addition to the "Superman" stories, which made them "new works subject to copyright" under Section 6 of the Act. This section contained no provision as to the date of the copyright notice to be used with respect to such "new works", but it did provide that "the publication of any such new works shall not affect the force or validity of any subsisting copyright" upon the original works or "be construed * * * to secure or extend copyright in such original works."

Manifestly, publication of these two numbers of the "Superman" magazine with a 1939 copyright date did not result in loss of the copyrights upon the stories originally published in "Action Comics" with a 1938 date. See West Publishing Co. v. Edward Thompson Co., 2 Cir., 176 F. 833, 837; Adventures in Good Eating v. Best Places to Eat, 7 Cir., 131 F.2d 809, 813; Amdur, Copyright Law & Practice, Chap. XIV, § 29, pp. 495–497; Ball, Law of Copyright and Literary Property, § 76, pp. 173–174.

I find that all the numbers of "Action Comics" have been properly copyrighted in the name of Detective and that the copyrights upon them, and the "Superman" stories published in them, have not been lost as the result of republication in the "Superman" magazine.

### The "Superman" Magazine.

In the spring of 1939, Detective began to publish quarterly another comic magazine, entitled "Superman", which also contained 64 pages and sold for ten cents a copy. Publication of the magazine was continued until the time of the trial. The magazine was devoted exclusively to "Superman", and its contents were almost entirely either reprints of "Superman" stories previously published in "Action Comics" or of "Superman" stories previously published in newspapers under an agreement between Detective and The McClure Newspaper Syndicate (hereafter referred to as "McClure"). The first four numbers were copyrighted by Detective. All subsequent numbers were copyrighted by Superman, Inc., which was not incorporated until October 1939. Both companies had the same officers and directors. Starting with Number 6, published in the fall of 1940, the magazine was changed to a bimonthly magazine.

It is contended by plaintiff that Superman, Inc. acquired the right to copyright these later numbers in its own name by virtue of an agreement between the two companies, dated January 18, 1940. By this agreement Detective appointed Superman, Inc., for the period ending March 31, 1945, its "exclusive agent to exploit 'Superman', the trade-marks and copyrights and/or other rights therein in any manner whatsoever", except that Superman, Inc. should not have the right "to print, publish or distribute any pictorial or textual sequence containing the likeness of 'Superman', other than through the magazine known as 'Superman'." The agreement further provided that "all copyrights, trade-marks and/or other rights with respect to 'Superman' now existing" should remain in Detective and continue to be owned by it, and that "when any further copyrights, trade-marks * * * or other similar rights are required to carry out the terms of this agreement", they should be obtained by Detective in its own name and the ownership of such rights should remain in it. The agreement contained no provision requiring or authorizing Superman, Inc. to take out copyrights in its own name. Notwithstanding this, Numbers 5 and 6, published in May and August 1940, were copyrighted in the name of Superman, Inc. It seems to have been discovered about August 1940 that this might have been an error. At any rate, Detective wrote Superman, Inc. on August 14, 1940, ratifying and confirming the copyrighting by the latter in its own name of the "Superman" magazine since January 18, 1940, and agreeing to the amendment of the agreement, as of January 18, 1940, so as to provide that further copyrights should be obtained by Superman, Inc. in its own name and be assigned to Detective upon demand or at the termination of the agreement. This letter could not, however, operate retroactively to validate the copyrights on Numbers 5 and 6. There was some testimony as to an oral modification, made prior to May 1940, of

354

the January 1940 agreement, to the same effect as the August 1940 letter, but I do not credit it.

■ "Superman" magazine No. 12 was published with the following notice: "Sept.-Oct. 1941, No. 12. Superman is published bi-monthly by Superman, Inc., 480 Lexington Ave., New York, N.Y. * * * Entire contents copyrighted by Superman, Inc." Fawcett's contention that this notice was not a sufficient compliance with the statute, in that the year of publication was omitted from the sentence "Entire contents copyrighted by Superman, Inc.", cannot be sustained. It was a substantial compliance, and that was enough. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 2 Cir., 161 F.2d 406, 409, certiorari denied 331 U.S. 820, 67 S.Ct. 1310, 91 L.Ed. 1837; Bentley v. Tibbals, 2 Cir., 223 F. 247, 253.

■ Nor can Fawcett's further contention be sustained that none of the copyrights upon the "Superman" magazine taken out in the name of Superman, Inc. is valid. It is argued that Superman, Inc. never became the proprietor of any material for which such copyrights could be taken out by it, but was merely an "exclusive agent". But the agreement between it and Detective, as modified on August 14, 1940, expressly authorized it to take out copyrights upon the magazine in its own name. Such an agreement is lawful, and a copyright taken out in accordance therewith is valid. In fact, that is the only way by which the rights of the publisher can be protected. Superman, Inc. holds the legal title to the copyrights as trustee, both for itself as the publisher and for Detective as the legal owner of the copyrighted material. Quinn-Brown Publishing Corp. v. Chilton Co., Inc., D.C.S.D.N.Y., 15 F.Supp. 213.

I find that all the numbers of "Superman" magazine have been properly copyrighted, either by Detective or by Superman, Inc., except Numbers 5 and 6, published in May and August 1940, and that the copyrights on these two numbers are invalid. This finding is not to be construed as validating copyrights on such strips or stories as were reprints of those previously published without proper copyright notice.

The Fawcett Magazines.

About October 1939, Fawcett, which had previously published only detective stories, began the work of preparing for the publication of a new monthly comic magazine, to be entitled "Whiz Comics" and to sell for the same price as "Action Comics". The first number appeared in January 1940. Each number contained several comic cartoon strips or stories, featuring different characters, the principal one being entitled "Captain Marvel", who was represented as a human being possessing superhuman attributes and as "an avenger of evil", and who had a dual personality with one Billy Batson, a radio reporter. "Captain Marvel" closely resembled "Superman" in his athletic figure and in his costume, as well as in the superhuman feats performed.

In June 1940 Fawcett published a "Special Edition Comics", another new monthly comic magazine, which, in the second number in February 1941, became "Captain Marvel Adventures". It sold for the same price as "Action Comics". Its contents were almost entirely cartoon strips or stories depicting the exploits of "Captain Marvel".

Fawcett continued to publish both these magazines until the time of the trial, despite a demand of Detective in June 1941 that it cease. The other Fawcett magazines need not be further considered, for they were similar in every way to "Whiz Comics" and "Captain Marvel Adventures", and plaintiff's evidence related chiefly to the first two magazines.

The Republic Motion Picture Photoplay.

On October 9, 1940, Fawcett entered into an agreement with Republic under which it granted to Republic the right to produce and exhibit a serial photoplay and to use in its production any of the characters, incidents and other material in the comic strips theretofore or thereafter published by it and entitled "Captain Marvel", together with the names of the characters, and the words "Captain Marvel", either alone or in conjunction with other words, as a title for the picture. Fawcett also warranted that it was the sole originator, author and owner

of the characters, incidents and other material in the "Captain Marvel" strips, and that they had been duly copyrighted.

Thereafter Republic produced a serial motion picture photoplay, using the comic strips of "Captain Marvel" which had appeared in "Whiz Comics". The title, as projected on the screen, was "Republic Pictures Presents Adventures of Captain Marvel * * *. Material from Whiz Comics, Copyright 1940 and 1941, Fawcett Publications, Inc." The picture was completed in February 1941 and was thereafter exhibited in many theatres in the United States, despite a notice to desist given by Detective in June 1941.

### Originality.

The "Superman" character and strips are clearly original. It was so held in Detective Comics v. Bruns Publications, 2 Cir., 111 F.2d 432, 433, an action for infringement of the copyrights upon the first eleven issues of "Action Comics", and there is no evidence in the present case to support a contrary finding. The court there said: "So far as the pictorial representations and verbal descriptions of 'Superman' are not a mere delineation of a benevolent Hercules, but embody an arrangement of incidents and literary expressions original with the author, they are proper subjects of copyright and susceptible of infringement because of the monopoly afforded by the act. * * * the complainant is not entitled to a monopoly of the mere character of a 'Superman' who is a blessing to mankind".

### Access.

Access to the "Action Comics" and "Superman" magazines by those employees of Fawcett who had to do with the creation, development and portrayal of the character of "Captain Marvel" and the cartoon strips featuring him, and with the preparation and publication of the early issues of the "Whiz Comics" magazine, is conceded.

### Copying.

The evidence as to actual copying is conflicting. Plaintiff called some of the employees of Fawcett just referred to. They testified to instructions from their superiors to imitate the "Superman" strips and the dialogue and script as closely as possible, and that they did so. Fawcett called the superiors, who denied having given any such instructions and denied any copying. An independent artist testified to admissions by Beck, Fawcett's chief artist, who drew the first "Captain Marvel" cartoons, as to his having copied "Superman". Beck, however, denied having made any such admissions. Experts were called by both parties, who contradicted each other as to the significance of claimed similarities and dissimilarities between the portrayals of the two characters, their facial appearances, costumes, etc., and the superhuman feats performed by them. It would serve no useful purpose to recite in detail the conflicting testimony, for I am satisfied from all the evidence that there was actual copying.

Both "Captain Marvel" and "Superman" have the same athletic physique. Both have substantially the same clean-cut faces. Both wear the conventional regalia of the gymnast or circus acrobat—skin-tight uniforms, boots, and a cape which is used in flying. The only real difference is in the color of their costumes, "Superman's" being blue and "Captain Marvel's" red. The incredible feats, performed by both, such as leaping great distances, flying through the air, exhibitions of marvelous strength and speed, and imperviousness to bullets, shells, explosions, knives and poisons, are identical, and the settings in which the feats are performed are often closely similar. Substantially all of the feats performed by "Superman" are later duplicated by "Captain Marvel." Identical phrases, expressions and dialogues are frequently found in the panels.

"Superman" is represented as a normal human being, a meek newspaper reporter wearing eye glasses (Clark Kent), who, by throwing off his regular clothes, appears in his athletic costume and becomes a superhuman being and performs superhuman feats in the interests of justice and to overthrow evil. "Captain Marvel" is likewise represented as a normal human being, a radio reporter (Billy Batson), who, by uttering the magic word "Shazam", is trans-

formed into a superhuman being, and, in that capacity, also performs superhuman feats in the interests of justice and to overthrow evil. There are villains in both stories, mad scientists who resemble each other in appearance, and who, by similar devices and methods, attempt to dispose of the hero ("Superman" or "Captain Marvel"), so that they can execute their plans of destruction without molestation.

The stories depicted in the respective panels are much the same, as, for example, the experiences of both Clark Kent and Billy Batson in applying for jobs as reporters, being turned down, and finally being accepted as the result of having performed the same superhuman feat. In other instances they are different. For example, there is no romantic element in the "Captain Marvel" stories, such as Lois Lane, the girl reporter, who is a permanent member of the "Superman" cast; nor do the "Superman" stories have an ever-present evil enemy of the hero, like Sivana.

### The McClure Newspaper Syndicate Agreement.

On September 22, 1938, Detective, Siegel and Shuster and McClure entered into an agreement. Briefly, it provided for the exclusive daily syndication by McClure in newspapers throughout the world of the "Superman" strips to be supplied by the artists, copyrights thereon to be taken out by McClure in its own name but to revert to Detective at the termination of the agreement, the title "Superman" to remain the property of Detective, McClure to return to Detective the original drawings, and. Detective to have the right to use the strips, six months after newspaper release, in "Action Comics" or any substituted magazine. McClure was to have only newspaper rights. The artists were to be paid by Detective, and McClure was to pay Detective a stipulated share of the receipts.

By a separate agreement Siegel and Shuster were employed by Detective on the same day to do the work, and they agreed that all the material should be owned by Detective and, at its option, copyrighted in its name or in the names of parties designated by it.

These newspaper strips were serialized,— i. e., the sequence of events continued on from one strip to another until the story was completed and a new one begun.

The strips were first published on January 16, 1939 in three newspapers—the Boston Transcript, the Milwaukee Journal and the San Antonio Express. The number of newspapers steadily increased and the aggregate number up to 1944 amounted to at least 160.

A very few of these strips as published in the newspapers carried the form of copyright notice required for a book. All the others carried no copyright notice whatever, or carried one of the following notices, viz.: (a) the words "McClure Newspaper Syndicate" alone, or (b) numerals representing the year, followed by the words "McClure Newspaper Syndicate", or (c) the letter "C" within a circle, followed by numerals representing the year, and the words "McClure Newspaper Syndicate" (the letter "C" in many cases being so small, or so blurred, that it appears to be only a dot or is to be discernible only with the aid of a magnifying glass), or (d) the word "Copyright" (sometimes spelled "Copyrig"), followed by numerals representing the year.

None of these notices, except those few which employed the book form, was sufficient to support a valid copyright. Section 18 of the Act required that, in the case of books, the copyright notice should consist either of the word "Copyright" or. of the abbreviation "Copr", accompanied by the name of the copyright proprietor, and, if the work was a printed literary work, the year of publication, but that, in the case of prints and pictorial illustrations, the notice might consist of the letter "C", enclosed within a circle, accompanied by the initials, mark or symbol of the copyright proprietor. (There is no requirement in the latter case that the notice shall contain the year of publication.)

██ I think that Section 18 required that each "Superman" strip, as published in the newspapers, should be copyrighted as a book. Each strip was a printed literary work, and the word "book" is not to be lim-

ited to a bound volume but includes "any species of publication which the author selects to embody his literary product." Holmes v. Hurst, 174 U.S. 82, 89, 19 S.Ct. 606, 609, 43 L.Ed. 904.

It is not correct to say that these "Superman" strips are prints or pictorial illustrations. A single panel might be called a print. But each strip consists of a number of panels, comprising a continuous sequence of events, with accompanying explanatory text. The panels are not used merely to illustrate the text, as the illustrations in a novel or other literary work do; rather, the panels themselves, together with the explanatory text, constitute the literary work—the story intended to be depicted. As the strips were not prints or pictorial illustrations, the use of the letter "C" in a circle as the form of copyright notice did not result in obtaining valid copyrights. Advertisers Exchange v. Anderson, 8 Cir., 144 F.2d 907.

But, even if Section 18 permitted the use of a notice in the form authorized for prints, it is necessary that, in substance at least, all the requirements of the section be complied with,—that is, that the notice contain the letter "C" in a circle, *and* the initials, mark or symbol of the copyright proprietor. Omission of either of these two elements is fatal. Mifflin v. R. H. White Co., 190 U.S. 260, 264, 23 S.Ct. 769, 47 L.Ed. 1040. And where the letter "C" in a circle is used, the letter must be distinguishable by the naked eye, unaided by the use of a magnifying glass. Goes Lithographing Co. v. Apt. Lithographing Co., D.C.S.D.N.Y., 14 F.Supp. 620; Deward & Rich v. Bristol Savings & Loan Corp., D.C. W.D.Va., 34 F.Supp. 345, affirmed 4 Cir., 120 F.2d 537.

Detective, however, insists that these were errors and omissions of McClure, by which it is not bound, for McClure was merely a licensee, and a licensee cannot relinquish or abandon the rights of his licensor. I think that this contention is unsound, as the agreement with McClure was not a mere license to use the strips but an agreement of joint adventure. In Ross v. Willett, 76 Hun 211, 213, 27 N.Y.S. 785, 786, which has of-

ten been cited by the New York courts, it was said: "A joint adventure is a limited partnership; not limited in a statutory sense as to liability, but as to its scope and duration; and under our law joint adventures and partnerships are governed by the same rules." And in Forman v. Lumm, 214 App.Div. 579, 583, 212 N.Y.S. 487, 490, a joint adventure was defined as follows:

"A joint adventure is defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.' Schouler, Personal Property (5th Ed.) § 167a. It is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. * *

"A contract by and in pursuance of which parties engage in a joint enterprise is to be enforced, and the rights and liabilities of the parties determined, upon the same principles as are applied by courts of equity to partnership transactions."

See also Chisholm v. Gilmer, 4 Cir., 81 F.2d 120, affirmed on other grounds 299 U.S. 99, 57 S.Ct. 65, 81 L.Ed. 63; Taylor v. Brindley, 10 Cir., 164 F.2d 235, 240–241.

The agreement with McClure contains all the elements of a joint adventure. The subject matter of the joint enterprise was the use of the "Superman" strips for the sole purpose of newspaper syndication. The artists agreed to create and draw the strips, Detective agreed to pay them for their work and to furnish the strips to McClure, and McClure agreed to sell the strips to newspapers. Both the artists and Detective agreed to cooperate with McClure. The proceeds of the sales (there could be no losses) were to be divided between Detective and McClure. As the agreement was one of joint adventure, the errors and omissions of McClure are chargeable to Detective, for the rights and obligations of joint adventurers are substantially those of partners, and each participant in a joint adventure is an agent for the others.

Fawcett's contention that McClure was neither the author, nor the pro-

prietor, nor the assign of the literary property in the strips, but was a mere licensee, and that it could not, therefore, take out valid copyrights upon the strips, is unsound. Section 8 of the Act limited the right to copyright a work to the author, or the proprietor, or the executors, administrators or assigns of the author or proprietor. The word "proprietor" in this section means assign. Public Ledger v. N. Y. Times, D.C.S.D.N.Y., 275 F. 562, affirmed 279 F. 747, certiorari denied 258 U.S. 627, 42 S.Ct. 383, 66 L.Ed. 798; Egner v. E. C. Schirmer Music Co., 1 Cir., 139 F.2d 398. Although McClure was neither the author, nor the proprietor, nor an assign, it agreed with Detective that it would copyright the syndicated strips in its own name and that the copyrights would revert to Detective at the termination of the agreement. Such an agreement is lawful, and a copyright taken out in accordance therewith is valid. Quinn-Brown Publishing Corp. v. Chilton Co., D.C.S.D.N.Y., 15 F.Supp. 213.

 Nor can Fawcett's further contention be sustained, that, as McClure was not the proprietor of one of the complete divisions of literary property created by the Act, it could not take out valid copyrights upon the strips. The argument is that Section 5 of the Act sets forth the divisions for which copyright may be secured, that subdivision (b) reads "Periodicals, including newspapers", that, as the agreement with McClure gave it rights in newspapers only, less than a statutory division was transferred to it and it could not, therefore, be a proprietor entitled to take out a copyright. But subdivision (b) does not contain two separate classes—periodicals *and* newspapers. Like all the other subdivisions, it specifies only one class, periodicals, and it must be read as though the language were "periodicals, which shall be construed as including newspapers". The reason for thus mentioning newspapers by name probably was that in 1900, only a few years before the passage of the Act, it was held that newspapers could not be copyrighted. Tribune Co. of Chicago v. Associated Press, C.C.N.D.Ill., 116 F. 126.

I find that, with very few exceptions, the copyrights upon the McClure syndicated newspaper strips are invalid, and that therefore these strips have been dedicated to the public.

### Abandonment.

The question remains whether the publication of this large number of syndicated newspaper strips without proper copyright notices resulted in an abandonment of the copyrights on the strips published in "Action Comics" with proper copyright notices. (It is not necessary, in this connection, to refer to the copyrights on the "Superman" magazine, for the strips published in that magazine were not original but merely reprints.)

There were sixty-seven different "Superman" stories published in the monthly issues of "Action Comics" from June 1938 to December 1943 (the only ones in evidence). During approximately the same period, i. e., from January 1939 to December 1943, there were published daily, without proper copyright notices, in many of at least 160 newspapers throughout the United States, numerous stories portraying "Superman" and all of his superhuman feats, closely paralleling the stories published in "Action Comics". The number of issues of the newspapers carrying these stories literally ran into thousands.

 It is quite true that the syndicated newspaper stories were not identical with the "Action Comics" stories, but they were so nearly similar that, if they had been published by a stranger, they would clearly be held to be infringements of the copyrights on the "Action Comics" stories. If a copyright owner authorizes or permits the republication of its copyrighted material without copyright protection, it forfeits, i. e., abandons the copyright. Dejonge & Co. v. Breuker & Kessler Co., 235 U.S. 33, 35 S.Ct. 6, 59 L.Ed. 113; Deward & Rich v. Bristol Savings & Loan Corp., 4 Cir., 120 F.2d 537; Atlantic Monthly Co. v. Post Pub. Co., D.C., Mass., 27 F.2d 556. I think the same result must certainly follow in the present case, where Detective has permitted publication in the newspapers, without copyright protection, of stories which were

the same in all material respects as its own copyrighted stories.

 I find, therefore, that the publication of the McClure syndicated newspaper strips without proper copyright notices resulted in the abandonment by plaintiff of the copyrights on the "Action Comics" stories. With this disposition it is unnecessary to consider any of the other instances in which the "Superman" stories or the "Superman" figure were published without proper copyright notices.

### Unfair Competition.

 The evidence does not justify any finding of unfair competition by either Fawcett or Republic; there is no proof either of palming off or of confusion; nor is there any misrepresentation, or any misappropriation "of what equitably belongs to a competitor". Schechter Corp. v. United States, 295 U.S. 495, 532, 55 S. Ct. 837, 844, 79 L.Ed. 1570. I see nothing in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, to the contrary.

The amended complaint accordingly is dismissed as against defendant Fawcett, with costs; and it necessarily follows that there be a similar dismissal as against both Republic defendants.

### On Motion for Retaxation.

 In view of the finding already made that there was "actual copying" by defendant Fawcett of plaintiff's cartoon strips, I am not disposed to make any allowance to Fawcett for an attorney's fee. See Advertisers Exchange v. Anderson, D.C.S.D.Iowa, 52 F.Supp. 809, affirmed 8 Cir., 144 F.2d 907; Krafft v. Cohen, D.C.E. D.Pa., 38 F.Supp. 1022.

 The situation as to the Republic defendants is different. They were charged only as contributory or secondary infringers; it was not found that they had copied plaintiff's strips. An allowance of $1,000 will be made to these defendants as an attorney's fee.

 Plaintiff has moved to re-tax the costs of the defendants by striking from the costs as taxed by the Clerk to Fawcett the

sum of $2132.71, and from the costs taxed to the Republic defendants the sum of $972.18, the amounts disbursed by them respectively for transcripts of depositions before trial of various witnesses examined by the parties. Plaintiff insists that these expenditures are not taxable unless they do more than serve the convenience of counsel in preparing the case for trial, and unless the depositions actually assist the court in deciding the case. It is customary in this District to tax such disbursements as costs where the depositions were taken in good faith, and whether or not they were actually used upon the trial. Here some of the depositions were introduced in evidence; some others were used on cross-examination. Many of them were used to develop facts which proved to be of considerable help in deciding the case. The Clerk properly included these amounts in his taxation of costs.

 The Republic defendants have also moved to re-tax their costs by including the sum of $1017.73, the cost of a daily transcript of the trial proceedings. No direction was made by the court that any such daily transcript be furnished, and there appears to have been no necessity therefor. The motion of the Republic defendants for retaxation is accordingly denied. Stallo v. Wagner, 2 Cir., 245 F. 636.

Judgment in accordance with this memorandum has been signed.