WARNER BROS. INC., Film Export, A.G., and DC Comics, Inc., Plaintiffs-Appellants,

v.

AMERICAN BROADCASTING COMPANIES, INC., Defendant-Appellee,

v.

STEPHEN J. CANNELL PRODUCTIONS, Third-Party Defendant-Appellee.

No. 1366, Docket 81–7192.

United States Court of Appeals, Second Circuit.

Argued April 23, 1981.

Decided July 17, 1981.

Melville B. Nimmer, Beverly Hills, Cal. (Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., of counsel), for plaintiff-appellant Warner Bros. Inc.

Philip R. Forlenza, New York City (Hawkins, Delafield & Wood, New York City, of counsel), for defendant-appellee American Broadcasting Companies, Inc.

Weiss, Dawid, Fross, Zelnick & Lehrman, New York City, of counsel, for plaintiffs-appellants DC Comics, Inc. and Film Export, A.G.

Townley & Updike, New York City, of counsel, for third-party defendant-appellee Stephen J. Cannell Productions.

Before MOORE and MESKILL, Circuit Judges and MacMAHON, District Judge.[*]

MESKILL, Circuit Judge:

This is an appeal from an order entered in the United States District Court for the Southern District of New York, Motley, J., which denied a motion made by plaintiffs, Warner Bros. Inc., Film Export, A.G., and DC Comics, Inc., for a preliminary injunction and temporary restraining order to enjoin the defendant, American Broadcasting Companies, Inc. (ABC), from (1) broadcasting certain promotional television spots relating to its series entitled "The Greatest American Hero" (Hero); (2) broadcasting the premiere of Hero; and (3) broadcasting any episode of Hero prior to affording the plaintiffs an adequate opportunity to examine the work and to seek appropriate relief. Plaintiffs alleged that ABC's Hero and related promotional campaign infringed their copyrights in the popular character Superman in violation of 17 U.S.C. § 501(b) (1976). Plaintiffs also alleged that Hero was likely to confuse the public into believing that Hero was either made, sponsored, or licensed by plaintiffs, and thus constituted unfair competition in violation of state law and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976). Judge Motley denied the motion, holding that plaintiffs had failed to carry their burden of demonstrating either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in their favor. For the reasons set forth below, we affirm.

## BACKGROUND

Plaintiffs are the owners of the copyrights and other rights in the character Superman and the works embodying him, including comic books depicting the cartoon character Superman; television series depicting Superman in animated and unanimated features; and the motion picture "Superman, The Movie." The plaintiffs have enjoyed remarkable commercial success for over forty years; they have derived substantial revenue from both domestic and international commercial exploitation of Superman.

The character "evolved" over the years in comic strips, cartoons, television shows, and motion pictures under the ostensible protection of copyright. A glance at the record,

[*] Honorable Lloyd F. MacMahon, Chief Judge, United States District Court for the Southern District of New York, sitting by designation.

for example, reveals that originally Superman was only capable of leaping in the position of a hurdler over tall buildings, while in a recent film version, "Superman, The Movie," the character is shown demonstrating an apparently later-acquired power of self-propelled flight; Superman assumes a more sophisticated and streamlined style, flying in the prone position, with arms extended in front of him and red cape billowing in the wind.

The entire fictional biographical account of Superman is retold in "Superman, The Movie." The character is depicted as a superhuman being from a fictional planet, Krypton, who was sent to earth to escape the fatal consequences of the imminent destruction of his planet. Superman is found by the Kents, a midwestern couple, who name the boy Clark and raise him as their son in a bucolic setting. The Kents instill in Clark a strong sense of moral conviction and faith in the "American way," and counsel the boy not to reveal his superhuman powers to anyone. Clark matures into a tall, well-built, dark-haired, and strikingly handsome young man. Ultimately, Clark leaves his pastoral home, finding himself drawn by a mysterious force to a place where he encounters the image of his deceased father, Jor-El. There, Jor-El informs him of his true identity and instructs him to use his superpowers to protect the world from evil. Clark emerges from his fantastic encounter with Jor-El wearing for the first time his Superman costume—a skin-tight blue leotard with red briefs, boots and cape, and a large "S" emblazoned in red and gold upon the chest and cape.

Clark subsequently obtains a position as a reporter for the *Daily Planet*, but reveals his true identity to no one, assuming instead the appearance of a shy, bumbling, but well-intentioned young man. There he soon meets and becomes infatuated with a beautiful colleague, Lois Lane. Later he appears clad in his Superman regalia to perform amazing feats of strength and courage which immediately attract wide attention, acclaim, and the amorous interest of Lois Lane.

Superman is continually confronted by villains in all of his adventures, but eventually overcomes all evil opponents by exploiting his superpowers of self-propelled flight, imperviousness to bullets, blinding speed, X-ray vision, fantastic hearing, and seemingly immeasurable strength. He fights for "TRUTH, JUSTICE AND THE AMERICAN WAY" and is often described as "FASTER THAN A SPEEDING BULLET," "MORE POWERFUL THAN A LOCOMOTIVE," and "ABLE TO LEAP TALL BUILDINGS IN A SINGLE BOUND." A. 518. For decades, startled pedestrians in comic strips have shouted, "LOOK, UP IN THE SKY ... IT'S A BIRD ... IT'S A PLANE ... IT'S 'SUPERMAN'!"

In January 1981, defendant ABC issued press releases and began to run promotional spots for the premiere of Hero. Hero was created and produced by Stephen J. Cannell Productions (Cannell), which was impleaded pursuant to a contractual indemnification agreement by ABC in this action as a third-party defendant.

The protagonist in Hero, Ralph Hinkley, is portrayed as a young high school teacher who is trying to cope with a recent divorce, a resultant dispute over the custody of his son, and the strain that his domestic problems place upon his work and his relationship with an attractive girlfriend. Hinkley's physical attributes are far from extraordinary; he is of medium height, and has a scrawny build and curly blond hair. According to the testimony of his creator, Hinkley is intended to typify the "ordinary guy."

In the premiere episode of Hero, Hinkley's van breaks down en route to a high school field trip in the desert. While walking along a road in search of help, Hinkley is nearly run over by an out-of-control automobile driven by Bill Maxwell, an American undercover agent. Maxwell has been searching the desert for his missing FBI partner who, unbeknownst to Maxwell, has been murdered by a band of extremists. Maxwell and Hinkley are suddenly approached by a brightly glowing spaceship from which descends the image of Max-

well's deceased partner. Hinkley is handed a magical caped costume—a red leotard with a tunic top, no boots, and a black cape—which, when worn, endows him with fantastic powers. Unfortunately, however, Hinkley loses the instruction book that accompanied the intergalactic gift and is left only with the verbal instruction that he should use his powers to save the world from self-destruction. Hinkley grudgingly accepts the mission after being importuned to do so by Maxwell.

While in the privacy of his bedroom the next day, Hinkley holds the suit in front of himself before a mirror and says, "IT'S A BIRD! IT'S A PLANE! IT'S RALPH HINKLEY!" Shortly thereafter he states cynically, "What the world needs is another flying superhero." Hinkley later reveals his newly acquired powers to his girlfriend and begs her understanding. Eventually, he uses his powers to overcome a villain's plan to destroy a portion of southern California.

Although Hinkley ultimately wins the battle with his evil opponent, he does not achieve this goal with the majestic grace, strength, skill, and panache characteristic of Superman. For example, when flying he hollers in fright, and invariably crash-lands, rather than landing with the aplomb of Superman. On one occasion while flying, Hinkley crashes into a building, is nearly knocked unconscious, and then is unceremoniously arrested for vagrancy. And though his magical costume renders him impervious to bullets, when being shot at by villains Hinkley cringes and cowers. Finally, after winning the day in his first adventure, Hinkley shakes the hand of his partner, Maxwell, but unfortunately fractures it, neglecting to restrain his super strength.

On March 16, 1981, two days before the scheduled broadcast of the premiere of Hero, plaintiffs filed their complaint seeking the injunctive relief previously described. Judge Motley viewed the promotional spots, the premiere episode of Hero, and "Superman, The Movie." The district judge also heard testimony concerning the creation and production of Hero and the promotional spots, and the characteristics of the superhero genre. Judge Motley concluded that the parties' works were not substantially similar, and that even if they were, Hero was a parody of Superman and therefore protected under the fair use doctrine. The district court also determined that it was unlikely that the public would be confused as to the origin of Hero, and that, therefore, preliminary injunctive relief was not warranted in connection with the plaintiffs' unfair competition claims. Thus, the defendant was permitted to televise the premiere of Hero on March 18, 1981 as scheduled.[1]

## DISCUSSION

To establish a claim for copyright infringement, a plaintiff "must show ownership of a valid copyright and copying by the defendant." *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977). Plaintiffs' copyrights and their validity were not contested for the purposes of the preliminary injunction motion, leaving only the issue of copying to be determined.

■ Because direct evidence of copying is ordinarily unavailable, a plaintiff is permitted to demonstrate copying through indirect proof. Thus, it is well settled that copying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that the two works are substantially similar. *See Novel-*

---

1. The defendants contend that the third prong of the injunction sought by the plaintiffs is nothing more than a discovery request colored as a request for an injunction and that the broadcast of the premiere of Hero on March 18, 1981 rendered the action in all other respects moot. We disagree. Plaintiffs never limited their request to enjoin only the March 18 broadcast of the premiere episode of Hero, and the defendants have not demonstrated that the episode will not be rebroadcast at some later date. We decline to interpret so narrowly the plaintiffs' motion as a request to enjoin the broadcast of the premiere episode of Hero on only that date. This being the case, we need not decide whether the third prong of plaintiffs' request alone would suffice to escape a claim of mootness.

*ty Textile Mills, Inc. v. Joan Fabrics Corp., supra; Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946). Owing to the apparent worldwide popularity of the Superman character, "access" is not a major issue in this case.[2] Rather, the principal issue in this action is whether Judge Motley abused her discretion in concluding that the parties' works are not substantially similar.

"[T]he determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations." 3 Nimmer on Copyright § 13.03[A], at 13–16 (rev.ed.1980) (emphasis in original). The general test for determining substantial similarity is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir. 1966). In the case of literary works, it is axiomatic that copyright protection only extends to the *expression* of the author's idea, not to the idea itself. *Holmes v. Hurst,* 174 U.S. 82, 86, 19 S.Ct. 606, 43 L.Ed. 904 (1899); *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir. 1930).[3] Thus, in determining whether two such works are so substantially similar as to reveal an infringement of one by the other, courts must decide whether the similarities shared by the works are something more than mere generalized ideas or themes. Attempting to afford some guidance on this perplexing issue, Judge Learned Hand set forth what later became known as his "abstractions test" in *Nichols* :

> [W]hen the plagiarist does not take out a block in situ, but an abstract of the whole, decision is more troublesome. Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

45 F.2d at 121 (citations omitted). Quite accurately, Judge Hand noted that "[n]obody has ever been able to fix that boundary, and nobody ever can." *Id.*[4] Nevertheless, we must once again perform the "difficult task" of "distill[ing] the nonprotected idea from protected expression." *Reyher v. Children's Television Workshop, supra,* 533 F.2d at 91.

This is not the first occasion we have been called upon to decide this issue in an action involving the copyrights in the famous character Superman. *See Detective Comics, Inc. v. Bruns Publications, Inc.,* 111 F.2d 432 (2d Cir. 1940); *see also National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594 (2d Cir. 1951). In *Bruns,* we held that while "the pictorial representations and verbal descriptions of 'Superman'" presented more than "a benevolent Hercules" and thus constituted "proper subjects of copyright," we cau-

---

2. With respect to one of the plaintiffs' works, "Superman, The Movie," however, the defendant claims that the author of Hero did not view the film prior to creating the Hero television series.

3. In 1976, the idea/expression distinction was statutorily embodied in the Copyrights Act, 17 U.S.C. § 102(b) (1976).

4. Three decades later, in his last reported decision on the subject, Judge Hand remarked:

> In the case of verbal "works" it is well settled that although the "proprietor's" monopoly extends beyond an exact reproduction of the words, there can be no copyright in the "ideas" disclosed but only in their "expression." Obviously, no principle can be stated as to when an imitator has gone beyond copying the "idea," and has borrowed its "expression." Decisions must therefore inevitably be *ad hoc.*

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960).

tioned that the owners of the Superman copyrights were not "entitled to a monopoly of the mere character of a 'Superman' who is a blessing to mankind." 111 F.2d at 433–34. This admonition was, of course, consistent with our earlier decisions in *Nichols* and *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1935), in which this Court ruled that generalized themes and ideas lie in the public domain and are not copyrightable. In deciding in *Bruns* that the defendant's "Wonderman" comic character infringed the plaintiff's copyrighted Superman works, the Court reviewed the parties' works, identified the similarities between them and concluded that the "only real difference between them is that 'Superman' wears a blue uniform and 'Wonderman' a red one." 111 F.2d at 433. The Court concluded that the defendants "used more than general types and ideas and . . . appropriated the pictorial and literary details embodied in the complainant's copyrights." *Id.* While our subsequent decision in *Fawcett Publications* did not turn on the issue of substantial similarity, Judge Hand made the following remark which sheds additional light on the subject:

> [A] copyright never extends to the "idea" of the "work," but only to its "expression," and . . . *no one infringes, unless he descends so far into what is concrete as to invade that "expression."*

191 F.2d at 600 (emphasis added).

■■ After reviewing the parties' works in this case, Judge Motley concluded that "[a] comparison of the characters Ralph Hinkley and Superman and their respective stories reveals . . . that they are so dissimilar as to preclude a finding of substantial similarity." A. 541. The plaintiffs contend that Judge Motley's statement betrays a fundamental misunderstanding of copyright law. They assert that Judge Motley incorrectly focused upon the differences rather than the similarities between the works. The plaintiffs further claim that, in placing

undue emphasis upon the disparities, Judge Motley disregarded what otherwise would be deemed substantial similarity between the works. We disagree.

While the works of plaintiffs and defendant share common ideas, themes, and general imagery, we believe that the similarities are not sufficiently particular and concrete so as to represent an appropriation of the protected expression of the plaintiffs' works. In arriving at this determination we also conclude that Judge Motley properly considered the great differences between the works in analyzing whether the parties' works were substantially similar.

Plaintiffs offer an extensive list of similarities between their works and those of the defendants to establish substantial similarity; for example, both superheroes are shown performing feats of miraculous strength; both wear tight acrobatic costumes; both do battle with villains; both fly with their arms extended in front of them and cape billowing behind; both are impervious to bullets; both have X-ray type vision; both have fantastic hearing and sight; both fly gracefully in the night sky past a city's lit skyscrapers; both lift a car with one hand; both lead a double life; both heroes' power emanates from another planet; and both are drawn to a mysterious spot to meet an extraterrestrial being. We find it unnecessary to recount several other purported similarities between the works suggested by the plaintiffs, since a close examination of the items already listed reveals the fallacy of their argument.

Though it is true that both heroes perform feats of miraculous strength, that is too common and general a characteristic or theme to even approach the degree of concreteness and particularity deserving of copyright protection. In any event, the expression of the general idea of a hero with miraculous strength in Hero and Superman substantially differs. In Hero, Ralph Hinkley derives his power exclusively from his magic suit, whereas in Superman, the hero's strength is a natural attribute of his extra-

terrestrial physical makeup. Additionally, Superman's exploitation of his strength is controlled, whereas Ralph Hinkley struggles at times to conjure it up and at other times to contain it. As to the common use of tight-fitting acrobatic costumes, the defendants convincingly established below that such garb is common in the superhero genre rather than unique to Superman. Moreover, while Superman wears a blue leotard with red briefs, boots and cape, Ralph Hinkley's costume is a red leotard with a tunic top, no boots, and a black cape. The plaintiffs suggest similarity between the works in that both heroes fight wealthy megalomaniacal villains; however, this suggested similarity concerns something hardly more specific or particular than the classic theme of good versus evil. With respect to the two heroes' common power of self-propelled flight, the defendants demonstrated satisfactorily that several comic strip superheroes possess the power of self-propelled flight and fly with their arms extended in front of them and capes billowing behind. But more important in this regard, the style of flying employed by Superman and Ralph Hinkley hardly could be more different. Superman has mastered the art of self-propelled flight and accomplishes the feat with grace and verve. Ralph Hinkley, on the other hand, seems to be terrified when flying and each time, without fail, crash-lands. Concededly both heroes at some point are shown lifting a car with one hand, but this display would seem to constitute a stereotypical means of demonstrating great strength, within the *scenes a faire* doctrine. *See Reyher v. Children's Television Workshop, supra,* 533 F.2d at 91. The latter notwithstanding, the scenes in each work in which a car is lifted differ substantially; in Superman, an infant lifts a pickup truck revealing fantastic strength to the Kents, his future step-parents, whereas in Hero, Ralph Hinkley lifts up an automobile to reveal and prove his supernatural strength to his girlfriend. As to the heroes' imperviousness to bullets, while the trait is shared, the expression of the concept differs dramatically. Ralph Hinkley cringes and cowers in the face of gunfire, whereas Superman boldly holds his ground when being fired upon. With respect to the plaintiffs' claim that both heroes share X-ray vision, Ralph Hinkley experiences holographic visions, whereas Superman sees *through* objects. Nor does the fact that both heroes lead double lives persuade us that the works are substantially similar. The defendants demonstrated below that other personages in the superhero genre lead double lives, their heroic side being kept in deep secrecy. And even more important, the expression of this classic literary idea differs between the two works in this case. In Superman, Clark Kent never reveals his true identity, whereas in Hero, Ralph Hinkley voluntarily discloses his part-time superhero status to his girlfriend. With respect to the scenes in which both heroes are shown flying at night with a lit city skyline in the background, the impact of the scene in Superman is majestic whereas the impact of the scene in Hero is humorous. Superman is shown flying gracefully; Ralph Hinkley flies holding a skylight in one hand for balance. Finally, the scenes in which the hero of each work is drawn mysteriously to a spot to meet an extraterrestrial being are hardly similar in expression. Superman encounters his deceased father's image at some polar icecap location; Ralph Hinkley encounters an unidentified flying object while sitting in an automobile with his future sidekick, Bill Maxwell, and is greeted by Maxwell's deceased partner.

We do not interpret Judge Motley's opinion to suggest that sufficient differences between two works will preclude a finding of substantial similarity notwithstanding the presence of similarities that would otherwise be sufficient to support such a finding. Judge Motley's opinion indicates that she properly focused upon "the similarities not the differences," A. 541, and simply adhered to the logic inherent in our statement in *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 913 (2d Cir. 1980), that "numerous differences tend to undercut

substantial similarity." While "[n]o plagiarist can excuse the wrong by showing how much of his work he did not pirate," *Sheldon v. Metro-Goldwyn Pictures Corp., supra,* 81 F.2d at 56, "a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's." 3 Nimmer, *supra,* § 13.03[B] at 13–37 (quoted with approval in *Durham Industries, Inc. v. Tomy Corp., supra,* 630 F.2d at 913 n.11). Thus, far from being irrelevant, in cases such as this where the alleged plagiarist "does not take out a block in situ," *Nichols v. Universal Pictures Corp., supra,* 45 F.2d at 121, an examination of the differences between two works may reveal the absence of substantial similarity. *See Reyher v. Children's Television Workshop, supra,* 533 F.2d at 93 (Court affirmed district court's finding that two scenes had "such substantial differences as not to warrant a finding of infringement"); *Nichols v. Universal Pictures Corp., supra,* 45 F.2d at 120 (Court held "defendant's play too unlike the plaintiff's to be an infringement"); *cf. Ideal Toy Corp. v. Fab-Lu Ltd., supra,* 360 F.2d at 1023 (Court emphasized "distinct differences" with respect to features of dolls in finding no infringement).

Finally, plaintiffs cannot seriously contend that the pattern of scenes, sequence of incident, principal characters, or the general theme between Hero and "Superman, The Movie," for example, are substantially similar. Quite to the contrary, as was the case in *Reyher v. Children's Television Workshop, supra,* 533 F.2d at 91–92 the "total concept and feel" of the two works greatly differ. The Superman works portray a benevolent superhuman who seeks to achieve noble goals through the exercise of innate superpowers while at the same time trying to maintain the secrecy of his true identity in order to occupy a position in society as an ordinary person. Hero on the other hand, is a "mirror image" of the Superman character. Hero depicts a typical, young American man with common everyday problems who attempts to cope with the impact upon his life caused by the superhuman powers that are foisted upon him by unidentified alien beings. We conclude that plaintiffs have attempted to demonstrate substantial similarity between the parties' works "by an analysis which alters the actual sequence or construction of plaintiff[s'] work in order to achieve a juxtaposition that makes for greater similarity with defendant[s'] work." 3 Nimmer, *supra,* § 13.03[E][3] at 13–48.

We do, however, believe it prudent to note our reservations in connection with Judge Motley's discussion of the parody defense. Suffice it to say that while the defense might be applicable to those isolated instances in which a nearly identical line from the plaintiffs' script, or express reference to one of the plaintiffs' characters was made, we question whether the defense could be used to shield an entire work that is substantially similar to and in competition with the copyrighted work.

■ Finally, Judge Motley also correctly determined that plaintiffs' unfair competition claims were insufficient to warrant the issuance of a preliminary injunction. Judge Motley did not abuse her discretion in determining that it was unlikely that the public would be confused as to the origin of Hero.

The order of the district court is affirmed and this action is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs of this appeal.